UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MOISE BLANDON,[1]

               Plaintiff,

    v.

MICHAEL CAPRA, SUPERINTENDENT,
SING SING CORRECTIONAL FACILITY;
LEROUGE R., SING SING CORRECTION
OFFICER; SERGEANT JOHNSON; JOHN
DOE 1-3, INDIVIDUALLY AND AS
UNKNOWN EMPLOYEES OF THE
DEPARTMENT OF CORRECTION &
COMMUNITY SUPERVISION

               Defendants.

No. 17-CV-65 (KMK)

OPINION AND ORDER

---

Appearances:

Moise Blandon
Ossining, NY
*Pro Se Plaintiff*

Bruce J. Turkle, Esq.
Assistant Attorney General of the State of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Pro se Plaintiff Moise Blandon ("Plaintiff"), currently incarcerated at Sing Sing

Correctional Facility, filed the instant complaint ("Complaint") pursuant to 42 U.S.C. § 1983

against Superintendent Michael Capra ("Capra"), Correction Officer Lerouge R. ("Lerouge"),

---

[1] Plaintiff's surname is listed as "Blando" on the docket, but he spells it "Blandon" in his filings. Accordingly, the Clerk of Court is directed to change the caption to reflect the correct spelling of Plaintiff's name.

Correction Officer Sergeant Johnson ("Johnson") (collectively, "Defendants"), and John

Does 1–3, as unknown employees of the Department of Correction & Community Supervision

("DOCCS"). (Compl. (Dkt. No. 2).) Plaintiff alleges that Defendants violated Plaintiff's rights

under the Fourteenth and Eighth Amendments when they failed to protect him from an HIV and

Hepatitis C-infected inmate, "Ebanks," who entered Plaintiff's cell and bit his face. (*See*

*generally* Compl.)[2]

Before the Court is Defendants' Motion To Dismiss the Complaint Pursuant to Federal

Rule of Civil Procedure 12(b)(6). (*See* Notice of Defs.' Mem. To Dismiss (Dkt. No. 23); Mem.

of Law in Support of Defs.' Mem. to Dismiss ("Defs.' Mem.") (Dkt. No. 24).)[3] Defendants

claim that Plaintiff's Action is barred for failure to exhaust available administrative remedies

pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and, alternatively,

that Plaintiff fails to state a claim. (Defs.' Mem.) For the following reasons, Defendants'

Motion is granted.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Complaint, (Dkt. No. 2), papers submitted

in response to Defendants' request for a pre-motion conference, (May 16, 2017 Letter to the

---

[2] The Complaint also alleges a violation of the Fifth Amendment. (Compl. ¶ 1.) The Fifth Amendment claim against Defendants is dismissed, because Defendants are not Federal Government officials. *See Hoegemann v. Palma*, No. 16-CV-1460, 2017 WL 455930, at *9 (D. Conn. Feb. 2, 2017) ("[Plaintiff] has not alleged that any federal official violated his Fifth Amendment due process rights. Instead, all of his allegations are against state or municipal officials. Thus, [Plaintiff]'s due process claims may only be brought under the Fourteenth Amendment, not the Fifth Amendment.")

[3] The Motion is only made on behalf of the named Defendants—Capra, Lerouge, and Johnson—and not John Does 1–3. (*See* Defs.' Mem.)

Court ("Obj. Letter") (Dkt. No. 15)), and Plaintiff's grievance ("the Grievance") filed in prison, (Decl. of Quandera T. Quick in Supp. of Defs.' Mot. to Dismiss ("Quick Decl.") Ex. A ("Grievance") (Dkt. No. 25), and are taken as true for the purpose of resolving the instant Motion.[4]  Plaintiff is a prisoner incarcerated at Sing Sing Correctional Facility, and, due to his intellectual disability, was in the custody of the Intermediate Care Program ("ICP"), which worked with the Office of Mental Health ("OMH"), during the time of the alleged events. (Compl. ¶ 8; Obj. Letter at 2.)

On June 14, 2016, while Plaintiff was confined to his cell, "Ebanks entered and physically assaulted Plaintiff[,] biting him in the face."  (Compl. ¶ 13.)  Ebanks was "well known" to unnamed ICP and OHM employees as "a person infected with HIV and Hepatitis C with the propensity to invoke unprovoke[d] assaults on [ICP] residents and staff."  (*Id.*; Grievance at 2 (Ebanks' HIV and Hepatitis C status "verified by the medical staff who[] attended

---

[4] In their pre-motion letter, Defendants argued that "it is clear from the face of the Complaint that Plaintiff did not file a grievance."  (Dkt. No. 14 at 2.)  In response, Plaintiff claimed that he did file a grievance. (*See* Obj. Letter at 2 (arguing that Defendants' contention is "dubious, if not worst [sic], misleading" and claiming "Plaintiff attached a grievance filed" with respect to the incidents involved in this case).)  Defendants then attached the Grievance as an exhibit to a Declaration submitted in support of the Motion To Dismiss.  (*See* Grievance.)  However, the Grievance does not support Defendants' Motion; rather, it is entirely consistent with the Complaint, and in fact contains additional factual allegations supporting the allegations in the Complaint.  (*Id.*)  Thus, construing Plaintiff's pro se complaint liberally "to raise the strongest arguments that [it] suggest[s]," the Court will consider the factual allegations in the Grievance.  *See Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted).  The Grievance is "consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. 2013) (internal quotation marks omitted), and Plaintiff knew about and relied upon it when he brought this Action, *see Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (permitting a court to consider documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit).  That Defendants, not Plaintiff, who is pro se, filed a document in support of Plaintiff's Complaint should not preclude the Court from considering the Grievance to Plaintiff's benefit.  In any event, because the Court still grants the Motion To Dismiss even considering the additional factual allegations in the Grievance, Defendants have no basis upon which to object to the Court's consideration of the Grievance.

[to Plaintiff]" at Sing Sing).)  At the time, Ebanks was supposed to be confined to his cell under "keeplock," a prison rule which "isolates unruly prisoners to their[] cells and prevents personal encounters with ICP's residents."  (Compl. ¶ 13.)  However, Officer Lerouge left "all [of] the cell's crank[s] open" and sat "in the office with the big noisy fan," thereby permitting Ebanks to "sneak[] out of his cell and run[] inside [Plaintiff]'s cell."  (Grievance at 1.)  Lerouge later claimed that he "hear[d] a commotion [in] the gallery" while "making a round," but "at no time did [he] observe the incident[,] nor did he hear the altercation as he claimed."  (*Id.*)  DOCCS "has failed to account" for how Ebanks entered Plaintiff's cell unnoticed to attack him.  (Compl. ¶ 13.)[5]

Following the incident, Plaintiff "told other inmates to notif[y] [] Officer [Lerouge] that [he] needed [an] emergency sick call because [he] was injured on [his] face."  (Grievance at 1.)  Officer Johnson prepared an "official misbehavior report" describing his observations following the attack, but failed "to account [for] his whereabouts prior to the" attack.  (Compl. ¶ 14.)[6]  He also "falsified the investigative report," claiming Plaintiff admitted to "being in a physical altercation in [] D-Gallery North Side [,] . . . in order to protect [Lerouge's] . . . negligence by leaving all the cell's tracks open and sitting [i]n the office not supervising the gallery[]."  (Grievance at 2.)  Johnson's action "was incompatible" with DOCCS rules and regulations, which "recognize[] the heighten[ed] risk ICP residents" pose to the general population, requiring

---

[5] Plaintiff claims to have attached documentation to this effect "as Exhibit A" of the Complaint, but no such exhibit exists.  (Compl. ¶ 13.)

[6] It is unclear whether "his whereabouts" refers to Johnson's or Lerouge's whereabouts. In light of the factual allegations in the Grievance about "protect[ing]" Lerouge, it more likely refers to Lerouge's whereabouts, not Johnson's.  (*See* Grievance at 2.)  Moreover, the Complaint alleges that Johnson "grossly neglected to supervise his subordinates who committed the wrongful act," which, although he fails to specify who those subordinates are, likely refers to Lerouge.  (Compl. ¶ 11.)

"separation and special care for those who suffer mental disabilities" to prevent "unforeseeable impulsive act[s] of violence" from them. (Compl. ¶ 14.) "DOCCS employees are trained to observe[] and prevent unsafe condition[s]" for ICP inmates. (*Id.*; *see also* Obj. Letter at 3 (alleging that "each Defendant[] [had] specialized training" under these "demanding" policies, which require compliance "without exception").) However, no DOCCS employee has "been sanction[ed] or reprimanded" for not following these rules. (Compl. ¶ 15.)

Plaintiff was hospitalized at the Sing Sing infirmary following the assault. (Grievance at 1.) Plaintiff now has a "permanent visual bite-mark on [his] face" which requires "consistent clinical testing" for HIV and Hepatitis C. (Compl. ¶ 15.) The bite also may "have accelerated" Plaintiff's pre-existing disease, myelogenous leukemia, which could result in "a speedier death." (*Id.*)

### B. Procedural Background

Plaintiff filed the Complaint on January 3, 2017. (Compl.) The Court granted Plaintiff's request to proceed in forma pauperis on January 26, 2017. (Dkt. No. 6.) On February 6, 2017, the Court issued an Order of Service, directing service on the named Defendants and directing that, pursuant to *Valentin v. Dinkins*, 121 F.3d 72, 76 (2d Cir. 1997), the New York State Attorney General's Office identify John Does 1–3 within 60 days so that Plaintiff may amend his complaint and these Defendants may be served. (Dkt. No. 8.) All 3 named Defendants were served. (*See* Dkt. Nos. 11, 12, 17.) However, the New York State Attorney General's Office never complied with the Court's *Valentin* Order, which, as Plaintiff noted in a letter to the Court on April 6, 2017, "inexcusably hampers Plaintiff's ability to . . . . fil[e] a timely Amended" Complaint. (Dkt. 9.)

Defendants submitted a letter for a pre-motion conference on May 5, 2017, indicating the grounds on which Defendants would move to dismiss. (Dkt. No. 14.) On May 16, 2017, Plaintiff filed a letter to the Court in response to Defendants' pre-motion letter. (Obj. Letter.) In addition to responding to Defendants' arguments regarding the merits of Plaintiff's claims, the letter also addressed exhaustion of administrative remedies, explaining that Plaintiff's intellectual disability prevented him from navigating or comprehending the DOCCS grievance process and therefore constitutes an exception to exhaustion. (*Id.* at 2.) Plaintiff also attached a letter from the Director of the Inmate Grievance Program at Sing Sing which explained that the grievance he filed regarding Ebanks' attack on him was denied as untimely by an IGP supervisor. (*Id.* at 4.)

Pursuant to a memo endorsement by the Court on May 22, 2017 setting a briefing schedule, (Dkt. No. 16), Defendants filed a Motion To Dismiss and accompanying papers on June 22, 2017, and then, after fixing docket entry errors, again on August 24, 2017, (Dkt. Nos. 18, 20; Dkt. Nos. 23–25).[7] The Court granted Plaintiff's request for an extension of time to respond to the Motion, (Dkt. No. 22), but Plaintiff did not ultimately submit papers in opposition to the Motion. On October 4, 2017, the Court denied without prejudice Plaintiff's Motion to Appoint Counsel. (Dkt. No. 29.)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

---

[7] Although timely, Defendants' initial filings were deficient and had to be re-filed on the docket. (*See* Dkt. Nos. 18, 20.)

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94

(2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted);

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). Finally, the "failure to oppose Defendants' [M]otion

[T]o [D]ismiss does not, by itself, require the dismissal of [Plaintiff's] claims." *Leach v. City of New York*, No. 12-CV-2141, 2013 WL 1683668, at *2 (S.D.N.Y. Apr. 17, 2013). Rather, "the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law." *McCall v. Pataki*, 232 F.3d 321, 322–23 (2d Cir. 2000).

### B. Analysis

#### 1. Exhaustion

Defendants argue that Plaintiff failed to exhaust his administrative remedies under the PLRA. (Defs.' Mem. 4–7.) "Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement. Accordingly, inmates are not required to specially plead or demonstrate exhaustion in their complaints. However, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citations and internal quotation marks omitted).

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory': An inmate 'shall bring 'no action' (or said more conventionally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). This requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2007), "regardless of the relief offered through administrative procedures," *Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison

grievance system holds out, and doing so *properly*. . . . Proper exhaustion demands compliance

with a prison grievance system's deadlines and other critical procedural rules." *Williams*, 829

F.3d at 122 (alterations, citations, and internal quotation marks omitted). Therefore, a court

evaluating exhaustion under the PLRA may not consider any "special circumstances" that it

believes may have justified a prisoner's failure to comply with the rules governing a grievance

system available to him or her. *Ross*, 136 S. Ct. at 1856–58 (rejecting "special circumstances

exception" to exhaustion, concluding that "a court may not excuse a failure to exhaust, even to

take such circumstances into account").

However, the PLRA contains one "textual exception to mandatory exhaustion." *Id.* at

1858. "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of

administrative remedies: An inmate, that is, must exhaust available remedies, but need not

exhaust unavailable ones." *Id.* Available "grievance procedures . . . are capable of use to obtain

some relief for the action complained of." *Id.* at 1859 (internal quotation marks omitted). In

*Ross*, the Supreme Court provided "three kinds of circumstances in which an administrative

remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. The

Court explained that an administrative remedy is unavailable when:

> (1) it operates as a simple dead end—with officers unable or consistently unwilling
> to provide any relief to aggrieved inmates;
> (2) an administrative scheme might be so opaque that it becomes, practically
> speaking, incapable of use. In this situation, some mechanism exists to provide
> relief, but no ordinary prisoner can discern or navigate it;
> (3) when prison administrators thwart inmates from taking advantage of a grievance
> process through machination, misrepresentation, or intimidation.

*Ross*, 136 S. Ct. at 1859–60. The Second Circuit recently noted "that the three circumstances

discussed in *Ross* do not appear to be exhaustive," but declined to "opine on what other

circumstances might render an otherwise available administrative remedy actually incapable of

use." *Williams*, 829 F.3d at 123 n.2.

To begin, Defendants have met their "initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sherriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). As Defendants explain, (Defs.' Mem. at 5–6), DOCCS instituted a three-step process, the Inmate Grievance Program ("IGP"), that inmates must follow in filing grievances involving prison conditions. *See* 7 N.Y.C.R.R. § 701.5. The first step requires that an inmate file his or her complaint with the facility's clerk "within 21 calendar days of an alleged occurrence." *Id.* § 701.5(a)(1). The IGP supervisor subsequently "review[s] the grievance complaint and designate[s] the grievance code and title." *Id.* § 701.5(a)(2). Representatives of the facility's inmate grievance resolution committee ("IGRC") then have up to 16 calendar days "to resolve it informally;" if not, "the full committee shall conduct a hearing" on the grievance. *Id.* § 701.5(b)(1), (2)(i). The IGP's second step permits an appeal of the IGRC's decision to the facility's superintendent, and the third step permits an appeal to the central office review committee ("CORC"). *Id.* § 701.5(c), (d).

Plaintiff does not dispute the existence of the IGP, and, in fact, acknowledges that he filed a grievance under the IGP. (*See* Compl. ¶ 21 (citing *Williams*, 829 F.3d at 124); Obj. Letter at 2 (citing *Rodriguez v. Reppert*, No. 14-CV-671, 2016 WL 6993383 (W.D.N.Y. Nov. 30, 2016)), 4 (attaching response to his grievance).) However, Plaintiff alleges that the grievance process is flawed, because it is too complicated to use for inmates such as Plaintiff who suffer from a mental disability. (Compl. ¶ 21.) The Grievance, regarding the incident involving

Ebanks on June 14, 2016, was filed on June 20, 2016. (Grievance at 1.)[8] Although the

Grievance was dated just 6 days after the incident—well within the 21-day time limit for filing

under § 701.5(a)(1)—the IGP supervisor apparently did not receive it until July 13, 2016, and

therefore rejected it as untimely. (Obj. Letter at 4 ("Bellamy Letter").)[9] On August 29, 2016,

Plaintiff received a letter from Karen Bellamy, Director of IGP, that acknowledges receipt of a

letter from Plaintiff dated July 26, 2016, but does not state what Plaintiff's letter said. (Bellamy

Letter.)[10] Bellamy's letter also notes that the 7-day time limit to appeal a superintendent's

response to a grievance under § 701.5(d)(1), and that Plaintiff "may challenge an IGP

Supervisor's decision not to accept an untimely appeal by filing a separate grievance." (*Id.*)[11]

Although Defendants contend that this letter proves Plaintiff "failed to challenge the

decision of the IGP supervisor," the Court disagrees. (Defs.' Mem. at 6.) Drawing all

---

[8] The Court reiterates that it may consider the Grievance when deciding the Motion To Dismiss. *See supra note 4.*

[9] It is not clear why the Grievance is dated June 20, but the IGP supervisor did not receive it until July 13. (Bellamy Letter).

[10] The Court may consider this document because Plaintiff attached it to his letter objecting to Defendants' pre-motion letter and it is consistent with Plaintiff's allegations that he could not effectively use the IGP due to his mental disability. (*See* Compl. ¶ 21; Obj. Letter at 2; Bellamy Letter.) *See Alsaifullah*, 2013 WL 3972514 at *4 n.3 (allowing the court to review "materials outside the complaint to the extent that they are consistent with the allegations in the complaint"); *Agu*, 2010 WL 5186839 at *4 n.6 (permitting review of "documents that a pro se litigant attaches to his opposition papers") (italics omitted).

[11] It is not clear why Bellamy's letter cites the time limit to appeal a superintendent's decision, which is part of Step 3 of the IGP, because neither the letter nor the Complaint indicate that Plaintiff actually appealed to the superintendent under Step 2. (Bellamy Letter.) *See* § 701.5(c) ("Second step, appeal to the superintendent."); *id.* § 701.5(d) ("Third step, appeal to the central office review committee (CORC)."). Indeed, no papers before the Court indicate Plaintiff even received a decision from the IGRC that he could appeal *to* the superintendent. *See id.* § 701.5(c)(1) (requiring that inmates submit appeal "to the grievance clerk within seven calendar days after receipt of the IGRC's written response" if they "wish[] to appeal to the superintendent").

reasonable inferences in favor of Plaintiff, *see Daniel*, 992 F. Supp. 2d at 304 n.1, this letter does not clearly show that Plaintiff failed to appeal the denial of his grievance as untimely or that he did not otherwise exhaust his remedies under the IGP.   The letter only shows that Plaintiff submitted unspecified "correspondence" in July, and that Bellamy informed Plaintiff of certain appeal requirements, not that he did not follow them.  (*See* Bellamy Letter.)  Therefore, because Plaintiff's failure to exhaust is not "clear on the face of the complaint" or the accompanying documents, the Court denies Defendants' Motion To Dismiss on exhaustion grounds.  *Williams*, 829 F.3d at 122.[12]  Accordingly, the Court need not consider Plaintiff's alternative argument—an open question in this Circuit—that the IGP procedures were not "available" to him because of his intellectual disability, therefore excusing his failure to exhaust.  *See Galberth v. Washington*, No. 14-CV-691, 2017 WL 3278921, at *8 (S.D.N.Y. July 31, 2017) ("The *Ross* Court did not opine on . . . whether an inmate's mental health condition can cause administrative-remedy unavailability.  Nor is this [c]ourt aware of any court that has considered this precise question in light of *Ross*'s clarification of PLRA availability.")

### 2.  Personal Involvement of Defendant Capra

Defendant Capra argues that the Complaint should be dismissed against him because he was not personally involved in any of the alleged constitutional violations.  (Defs.' Mem. 10–

---

[12] In support of the Motion To Dismiss, Defendants submitted a Declaration from Quandera T. Quick, the IGP supervisor who received the Grievance, stating that Sing Sing's IGRC files do not contain "any grievances filed by Plaintiff challenging a decision not to accept his July 13, 2016 complaint as untimely." (Quick Decl. ¶ 6.)  The Court declines to consider this Declaration at the motion to dismiss stage.  *See Leonard F.*, 199 F.3d at 107 (confining the district court to considering the complaint, "documents appended to" it "or incorporated . . . by reference," and "matters of which judicial notice may be taken"); *Alsaifullah*, 2013 WL 3972514, at *4 n.3 (permitting a court to consider materials outside a pro se complaint only "to the extent that they are consistent with the allegations in the complaint").  However, the Court notes that this evidence may be considered at the summary judgment stage, and Plaintiff will have to contend with the factual assertions therein if the case gets to that stage.

11.)  "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).   To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted).  In other words, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

Plaintiff has failed to satisfy this standard as to Capra.  The gravamen of the Complaint is that, as an ICP resident, Plaintiff faced a serious risk of harm from Ebanks, a dangerous ICP inmate, and that Defendants, who were aware of this risk through their knowledge of and training in policies requiring observation and separation of ICP inmates, failed to protect him by not enforcing those policies.  For purposes of alleging personal involvement—as opposed to actual unconstitutionality—the Complaint sufficiently alleges that Lerouge directly participated in the alleged constitutional violation by leaving the cell tracks open and failing to supervise the ICP gallery, resulting in Ebanks attacking Plaintiff.  (Compl. ¶¶ 10, 20; Grievance at 1.)  *See Grullon*, 720 F.3d at 138 (explaining that personal involvement is a prerequisite to individual liability in a § 1983 suit).  Similarly, the Complaint alleges that Johnson was grossly negligent in supervising Lerouge, who was supposed to monitor the ICP gallery and keep Ebanks confined to

his cell (Compl. ¶¶ 11, 14, 20; Grievance at 2.)[13]

However, the Complaint contains no allegations that Capra was personally involved in the alleged violations of Plaintiff's constitutional rights. The Complaint mentions Capra only to state that he is the custodian at Sing Sing, "the policymaker therefrom and failed to take any proactive action to remedy the wrong by its subordinates who committed the unconstitutional act." (Compl. ¶ 9; *see also* Obj. Letter at 3 (referring to Capra as "the author behind" the policy Defendants violated).) While this language parrots that of the caselaw requiring personal involvement, *see Grullon*, 720 F.3d at 138 (requiring that "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom" (internal quotation marks omitted)), the Complaint provides no supporting factual allegations required to survive a motion to dismiss. *See Twombly*, 550 U.S. at 555 (explaining that "a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" (alterations and internal quotation marks omitted). Capra cannot be held personally liable for constitutional violations merely "because he was in a high position of authority" at Sing Sing. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Nor does the generic allegation that he was a "policymaker," without more, plausibly show that he created a policy which permitted unconstitutional practices to occur. (Compl. ¶ 9.) Indeed, Plaintiff's complaint is that the other Defendants acted unconstitutionally by *violating* the policy that Capra purportedly authored. (*See* Obj. Letter at 3; Compl. ¶¶ 10, 14.) Moreover, Plaintiff alleges no

---

[13] The Complaint also asserts that Johnson "created a policy or custom under which unconstitutional practices would recur." (Compl. ¶ 11.) Although this conclusory allegation reflects one category of personal involvement, *see Grullon*, 720 F.3d at 139, Plaintiff alleges no facts regarding what policy or custom Johnson created, how it led to unconstitutional practices, or what those unconstitutional practices were.

facts suggesting Capra was aware that Defendants or others at Sing Sing were violating policy or otherwise failing to supervise and confine ICP inmates, let alone that Plaintiff specifically was at risk. *See Wright*, 21 F.3d at 501 (finding no personal involvement when the defendant "was never put on actual or constructive notice of the [rule] violation," did not "create a policy or custom under which the violation occurred," and did not "act[] negligently in managing subordinates who caused the violation"). Thus, to the extent Plaintiff claims that Capra was informed of the violations and "failed to remedy" them, that he "was grossly negligent in supervising" Johnson and Lerouge, or that he "fail[ed] to act on information indicating that unconstitutional acts were occurring," the Complaint is devoid of specific allegations plausibly supporting such a claim. *Grullon*, 720 F.3d at 138. The Court therefore dismisses Plaintiff's claims against Capra.

### 3. Eighth Amendment

Defendants argue that the Complaint fails to state a claim under the Eighth Amendment. (Defs.' Mem. at 7–9.) The Eighth Amendment, which prohibits cruel and unusual punishment, requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (same). Specifically, "[p]rison officials have a duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Lee v. Artuz*, No. 96-CV-8604, 2000 WL 231083, at *4 (S.D.N.Y. Feb. 29, 2000) (quoting *Farmer*, 511 U.S. at 834). However, "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Instead, "the prisoner must allege actions or

omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes*, 84 F.3d at 620; *see also Price v. Oropallo*, No. 13-CV-563, 2014 WL 4146276, at *8 (N.D.N.Y. Aug. 19, 2014) ("Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety.").

To satisfy the deliberate indifference standard, a plaintiff must show that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) "the defendant prison officials possessed sufficient culpable intent." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511 U.S. at 834). The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 30, 33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 (1989)). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." *Hayes*, 84 F.3d at 620. In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Price*, 2014 WL 4146276, at *8 (explaining that to establish deliberate indifference, "a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety"). A defendant's knowledge can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk."

(internal quotation marks omitted)).

Defendants do not contest that the Complaint plausibly alleges facts satisfying the objective prong of the deliberate indifference test. (Defs.' Mem. at 8–9.) *See Hayes*, 84 F.3d at 620 (requiring Plaintiff show that "he is incarcerated under conditions posing a substantial risk of serious harm"). Instead, they argue that Plaintiff has failed to state a claim under the subjective prong, because he does not allege that Defendants were "aware of facts from which they could infer that a substantial risk existed that Plaintiff would be harmed by Ebanks, and that they drew that inference." (Defs.' Mem. at 8.) *See Farmer*, 511 U.S. at 837 (explaining the subjective prong).

The Complaint alleges that Ebanks was "well known" to unnamed ICP and OHM employees "as a person infected with HIV and Hepatitis C with the propensity to invoke unprovoked[d] assaults on [ICP] residents and staff alike." (Compl. ¶ 13.) And, it contends that the "wrongful acts challenged in [the] Complaint" were done by "ICP or OHM employees . . . with sound deliberation of inmate Ebanks' propensity to violence, praying on vulnerable defens[e]less ICP[] residents without close strict supervision." (Compl. ¶ 12.) However, the Complaint does not allege that any of the Defendants—a Superintendent and two Correction Officers—were employees of ICP, a "residential treatment program," or OHM, a division relating to inmates' health. (*See* Obj. Letter 2; Compl. ¶¶ 8–11.) Indeed, the Complaint alleges that these ICP and OHM employees were "working in concert with DOCCS[] employees," implying a distinction between the two types of employees. (Compl. ¶ 13.)

The Complaint contains only one other allegation regarding Ebanks' violent disposition: he was supposed to be on "keeplock," a policy that "isolates unruly prisoners to their[] cells and prevents personal encounters with ICP's residents," the day he attacked Plaintiff. (Compl. ¶ 13.)

However, the Complaint does not state who placed Ebanks under "keeplock," or who else was aware that he was so designated. (*Id.*)[14] Indeed, it is unclear whether "keeplock" is a policy governing only ICP inmates, or if it applies throughout Sing Sing (or DOCCS generally). (*Id.*) The Complaint also does not describe *why* Ebanks was placed on keeplock, or provide any other reason that Ebanks could be considered "unruly." (*Id.*) For example, Plaintiff does not allege that Defendants were aware of prior altercations between Ebanks and Plaintiff, or even between Ebanks and other inmates. (*Cf.* Compl. ¶ 13 (alleging that Ebanks was "well known to (ICP) and (OHM) employees working in concert with DOCCS[] employees").) Indeed, aside from a conclusory allegation that "[D]efendants[] w[ere] fully aware of [the] unsafe condition and refused to take any measures whatsoever to protect the safety of the most vulnerable mental health offenders," the Complaint is devoid of *any* allegations that any Defendant specifically knew that Ebanks was infected with HIV or Hepatits C, that he had a propensity to assault other inmates, or that Plaintiff personally was in danger of being assaulted by Ebanks. (Compl. ¶ 3.) The Complaint therefore fails to allege that Defendants were "aware of facts from which the inference could be drawn that" Ebanks specifically posed a substantial risk of harm to Plaintiff, or that Defendants in fact drew such an inference. *Farmer*, 511 U.S. at 837; *see also Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2003) (dismissing failure to protect claim because the Complaint failed to allege that "the defendants knew of a prior altercation between the plaintiff and his attacker, or of threats that had been made against the plaintiff").

However, Plaintiff could satisfy the subjective prong of the deliberate indifference

---

[14] Plaintiff's allegation that Lerouge left the tracks open, without more, does not plausibly allege that Lerouge placed Ebanks on "keeplock" or knew he was so designated. (*See* Grievance at 1–2.)

inquiry by alleging facts demonstrating that Defendants were aware of, and consciously disregarded, a general risk of assault faced by all inmates in ICP.  *See id.* ("A plaintiff may also state a claim for deliberate indifference based on a failure to protect him against a general risk of harm to all inmates at the facility."); *Farmer*, 511 U.S. at 843 (permitting a plaintiff to allege a risk of harm faced by "all prisoners in his situation").  Plaintiff may do so by alleging facts plausibly suggesting "that the risk was obvious."  *Id.* at 842.

Plaintiff alleges that "DOCCS specifically trains its employees [in] the necessity to protect ICP residents," (Compl. ¶ 12), including training "to observe[] and prevent unsafe condition[s] to ICP's resident[s]," (*Id.* ¶ 14).  Plaintiff further alleges that "each Defendant[]" received "specialized training" in these "demanding" policies governing ICP inmates, (Obj. Letter at 3), including Lerouge, (Compl. ¶¶ 10, 20).  The policies "recognize[] the heighten[ed] risk ICP residents" pose, requiring their "separation" to prevent "unforeseeable impulsive act[s] of violence" from them.  (Compl. ¶ 14.)  The risk of violence is particularly high for other ICP inmates.  (*See* Compl. ¶ 12 (alleging that breach of rules "elevates the risk substantially threatening the life, safety and welfare of all IC[P] residents"); *id.* (describing ICP residents as "vulnerable [and] defenseless"); ¶ 14 (alleging that Johnson's actions "elevated a substantial risk of harm to Plaintiff being viciously attacked"); *id.* (alleging risk of "unforeseeable impulsive act[s] of violence" from ICP inmates); *id.* (describing risk of "unsafe condition[s] to ICP[] resident[s]"); ¶ 20 (noting that policies "oversee[] ICP's resident[s] from unprovoked assault"); Obj. Letter at 3 (alleging that disregard of "Defendant[s]' specialized training elevate[d] [the] 'chance' [of] foreseeable harm").)[15]  Therefore, although the Complaint could have alleged more

---

[15] Although the Complaint lacks clarity as to whether the policies at issue are designed primarily to protect general population inmates from dangerous ICP inmates, or whether they only protect ICP inmates from each other, (*see, e.g.*, Compl. ¶ 14 (describing the "risk ICP

detail regarding the prevalence or likelihood of inmates attacks in ICP, *see, e.g.*, *Manning v. Griffin*, No. 15-CV-3, 2016 WL 1274588, at *11 (S.D.N.Y. Mar. 31, 2016) (dismissing complaint because it "contains no allegations about any pattern of violence" at the prison, including "allegations that *any* inmates had ever been involved in *any* attacks [there], let alone that such attacks were common and thus would provide notice to [the d]efendants that the conditions . . . posed a substantial risk to inmates"), the Court finds that the Complaint plausibly alleges that Defendants were trained in these policies requiring supervision and separation of ICP inmates, and therefore were aware that attacks on other ICP inmates were foreseeable absent enforcement of the policies. *See Farmer*, 511 U.S. at 842–43 (explaining that a risk may be so "obvious" that the defendant's actual knowledge may be inferred when the evidence "show[s] that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and that "the circumstances suggest" that the defendant "had been exposed to information concerning the risk" (internal quotation marks omitted)); *cf. Rennalls v. Alfredo*, No. 12-CV-5300, 2015 WL 5730332, at *4 (S.D.N.Y. Sept. 30, 2015) (dismissing failure to protect claim where the plaintiff did "not allege that attacks . . . were common in general or otherwise foreseeable").

However, deliberate indifference requires more than knowledge of the risk of harm. Defendants must have "disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620. Plaintiff alleges that Lerouge was "negligen[t]" by leaving the cell tracks open and then sitting out of eyesight or earshot of the cells "on the gallery," including

---

residents threaten[] general population which requires separation" but also noting training to "observe[]] and prevent unsafe condition[s] to ICP[] resident[s])), the Court, accepting all factual allegations as true and construing them liberally, interprets the Complaint to allege that the protocols also protect ICP inmates from each other for the purposes of this Motion.

Plaintiff's and Ebanks' cells, (Grievance at 1–2), in violation of his "strict training," (Compl. ¶ 20).  However, "mere negligence" cannot constitute deliberate indifference.  *Hayes*, 84 F.3d at 620; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (explaining that deliberate indifference requires recklessness and that "recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent"). Although leaving the cell tracks open and subsequently "not supervising the gallery[]" may have been careless, (Grievance at 2), Plaintiff does not include allegations that plausibly establish that Lerouge possessed a sufficiently culpable state of mind to constitute deliberate indifference.  *See Ross v. Correction Officers John & Jane Does 1–5*, 610 Fed. App'x 75, 78 (2d Cir. 2015) ("While [the defendant] may have exercised poor judgment in temporarily leaving his post, 'deliberate indifference describes a state of mind more blameworthy than negligence.'" (quoting *Farmer*, 511 U.S. at 835)); *Rennalls*, 2015 WL 5730332, at *5 ("At most, Plaintiff's claims suggest that [the defendant] was negligent in failing to follow security protocol.  Under the second prong of a failure to protect claim, however, a plaintiff must allege a culpable state of mind."); *cf. Graham v. Coughlin*, No. 86-CV-163, 2000 WL 1473723, at *5 (S.D.N.Y. Sept. 29, 2000) ("In situations where corrections officers have deliberately left cells doors open in order to leave a prisoner vulnerable to vicious attack, the courts rightly have expressed outrage.").  And, in fact, by alleging that "at no time did [Lerouge] observe the incident nor did he hear the altercation as he claimed he did," Plaintiff concedes that Lerouge lacked knowledge of the assault at the time.  (Grievance at 1.)  Plaintiff further alleges that Lerouge later "lied about making a round and hearing a commotion on the gallery in attempt to mislead the investigation" regarding his negligence.  (Grievance at 1.)  But, while Lerouge's purported decision to lie about his negligence is questionable, it does not plausibly establish that Lerouge knew of and

disregarded a risk to Plaintiff. *See Hayes*, 84 F.3d at 620 (requiring that the defendant possess "knowledge that an inmate faces a substantial risk of serious harm" and that he "disregard[] that risk by failing to take reasonable measures to abate the harm"); *Rennalls*, 2015 WL 5730332, at *5 (finding that "negligen[ce] in failing to follow security protocol" alone does not establish a "culpable state of mind").

As to Johnson, Plaintiff alleges no facts suggesting that he was deliberately indifferent to the risk that Plaintiff would be harmed by another ICP inmate like Ebanks. Reading the Complaint and Grievance together, Plaintiff alleges that Johnson (1) failed to supervise Lerouge, who violated the policies governing ICP inmates, and (2) falsified the investigative report concerning Ebanks' attack on Plaintiff to protect Lerouge's behavior. (*See* Compl. ¶¶ 11, 14; Grievance 1–2.) However, Plaintiff provides only general allegations, without any factual detail, of Johnson's purported lack of supervision, and merely labels these actions illegal or unconstitutional. (*E.g.*, Compl. ¶ 11 (claiming Johnson "grossly neglected to supervise his subordinates" and "exhibited deliberate indifference").) Absent further allegations regarding what Johnson did or what he should have done under DOCCS policy, and how these acts or omissions disregarded the risk that Plaintiff would be attacked by a dangerous ICP inmate like Ebanks, Plaintiff's Eighth Amendment claim against Johnson cannot survive a motion to dismiss. *See Hayes*, 84 F.3d at 620 (explaining subjective standard for deliberate indifference); *Wilkins v. Poole*, 706 F. Supp. 2d 314, 319 (W.D.N.Y. 2010) (finding that the plaintiff failed to state a claim because, "even assuming arguendo that the defendants were equally aware of the general dangers of prison life," the plaintiff failed to allege "that the defendants were aware of specific deficiencies in [prison] policies and failed to act" (italics omitted)); *Graham*, 2000 WL 1473723, at *5 (finding no deliberate indifference where the "plaintiff failed to demonstrate a

policy or custom of mixing [two different inmate] populations" and "does not allege [the] defendants' gross negligence in managing subordinates"). Similarly, although Plaintiff alleges that Johnson "falsified the investigative report" of the Ebanks incident to omit Lerouge's negligence and "to protect him," (Grievance at 2), this action does not demonstrate deliberate indifference to Ebanks' attack on Plaintiff, which occurred earlier.[16]

Accordingly, Plaintiff fails to plausibly state a failure to protect claim as to Defendants, and the claim is dismissed.

### 4. Fourteenth Amendment

The Complaint alleges a claim under the Fourteenth Amendment. (Compl. ¶¶ 1, 4.) However, it is unclear whether Plaintiff is claiming a violation of procedural or substantive due process, or both. To the extent that the Complaint alleges a violation of substantive due process, it is the same as Plaintiff's Eighth Amendment claim for failure to protect and deliberate indifference. (*See* Compl. ¶ 1 (stating the Complaint is "sounding in *Farmer v. Brennan*"); *id.* ¶ 11 (Johnson's "deliberate difference . . . is sufficient to offend Plaintiff's . . . Fourteenth and Eight[h] Amendment protection"); *id.* ¶ 18 ("continuous failure to protect violated Plaintiff's right to substantive and procedur[al] due process under the . . .Fourteenth and Eight[h] Amendment[s]").) Because Plaintiff's claim "is covered by . . . [the] Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the

_____

[16] Construing Plaintiff's complaint liberally, the Court could draw a plausible inference that falsifying a report is evidence of consciousness of guilt. *See Hammond v. Bradley*, No. 06-CV-6365, 2008 WL 1340653, at *1 (W.D.N.Y. Apr. 9, 2008) (explaining that allegation "that [the] defendants filed a false misbehavior report against" the plaintiff was "only intended to show that [the] defendants attempted to cover up their misdeeds, which might tend to show some consciousness of guilt on their part"). However, Plaintiff alleges only that the falsification was "in order to protect" Lerouge's "negligence." (Grievance at 2.) Absent more factual detail, it is unclear to the Court how consciousness of guilt regarding Lerouge's earlier negligence could plausibly show deliberate indifference.

rubric of substantive due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998); *see also Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir. 2000) ("Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." (alterations and internal quotation marks omitted)). Because Plaintiff does not allege any additional conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," the Court concludes that Plaintiff's substantive due process claim is "subsumed in [his] more particularized allegations" regarding his Eighth Amendment claim. *Velez v. Levy*, 401 F.3d 75, 93, 94 (2d Cir. 2005) (quoting *Lewis*, 523 U.S. at 847 n.8).[17]

Accordingly, Plaintiff's substantive due process claim is dismissed.

To the extent the Complaint alleges a procedural due process claim, it is seemingly based on Defendants' violation of prison policy. (Compl. ¶ 16 ("Defendants continuously refuse to

---

[17] The Second Circuit recently held that deliberate indifference claims under the Due Process Clause of the Fourteenth Amendment are analyzed differently than the same claims under the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). However, the Second Circuit limited its holding to pretrial detainees, who "have not been convicted of a crime and thus may not be punished in any manner." *Id.* at 29 (citation and internal quotation marks omitted); *see also id.* at 33–34 (relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which analyzed excessive force claims by pretrial detainees under the Fourteenth Amendment); *McCray v. Lee*, No. 16-CV-1730, 2017 WL 2275024, at *4 (S.D.N.Y. May 24, 2017) ("The status of a plaintiff as either a convicted prisoner or pretrial detainee dictates whether his conditions of confinement are analyzed under the Eighth or Fourteenth Amendment. . . . While the decision in *Darnell* set forth a new analysis for claims brought by pretrial detainees, the analysis under the Eighth Amendment remains intact." (citation omitted)). Plaintiff was not a pretrial detainee at the relevant time. (Compl. ¶ 8.) In any event, *Darnell* maintained that "any § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." 849 F.3d at 36 (italics omitted). Thus, to the extent Plaintiff's substantive due process deliberate indifference claim is not subsumed by his Eighth Amendment deliberate indifference claim, it still fails, because, as explained above, Plaintiff has not plausibly alleged that Defendants acted with more than mere negligence. *See Farmer*, 511 U.S. at 834 (explaining that the defendant must act voluntarily, not accidentally, indifferent to a serious risk).

implement[] change[s] to protect ICP's resident[s] infringes on Plaintiff's procedur[al] due process.").)[18]  "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (internal quotation marks omitted).  Plaintiff does not possess a protected liberty interest in having Defendants follow prison policy.  *See Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("An alleged violation of a prison policy, directive, or regulation, in and of itself, does not give rise to a federal claim, because '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.'" (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990)); *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002) ("[T]he law is settled that the failure to follow a DOC[C]S Directive or prison regulation does not give rise to a federal constitutional claim.").  In any event, even assuming that Plaintiff adequately alleges a more generalized liberty interest in being protected from other inmates, he identifies no *process* that he was deprived of.  *See Giano*, 238 F.3d at 225 (requiring plaintiff to show that defendants deprived him or her of a liberty interest "as a result of insufficient process").  Accordingly, Plaintiff's procedural due process claim is dismissed.[19]

## III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted.  However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice.

---

[18] To the extent that Plaintiff meant that current policy is inadequate and should be changed to prevent attacks like the one committed by Ebanks, he alleges no facts supporting that claim.  However, Plaintiff is free to do so in an amended complaint that explains precisely what policy fails to afford adequate process.

[19] Because the Court grants the Motion To Dismiss on the grounds that Plaintiff failed to state a claim under the Eighth or Fourteenth Amendments, the Court need not reach Defendants' alternate argument that they are entitled to qualified immunity.  (*See* Defs.' Mem. at 12–14.)

Within 14 days of the date of this Opinion, the New York State Attorney General's Office, the attorney and agent for DOCCS, is directed to comply with the Court's previous *Valentin* Order and provide the names and service addresses of John Does 1–3 to Plaintiff and the Court. (*See* Dkt. No. 8.)

Within 30 days of receiving this information, Plaintiff must file an amended complaint naming the John Doe Defendants. Once Plaintiff has filed an amended complaint, the Court will direct the Clerk of Court to fill out a USM-285 form for each of the new Defendants, issue a summons, and deliver all of the paperwork necessary to the Marshals Service to effect service upon Defendants.

Plaintiff should also include within that amended complaint any changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. The amended complaint will replace, not supplement, the original complaint. The amended complaint must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider, including the specific actions or omissions of each Defendant that violated Plaintiff's constitutional rights, and any facts showing that Defendants were aware of the risk to Plaintiff's safety and how they disregarded that risk. If Plaintiff fails to abide by the 30-day deadline, this Action could be dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 23), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: November 16, 2017
     White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

27